## S01P1789. BRANNAN v. THE STATE.

(561 SE2d 414)

CARLEY, Justice.

A jury found Andrew Brannan guilty of malice murder for the shooting death of Deputy Sheriff Kyle Dinkheller. The jury recommended a death sentence after finding the following aggravating circumstances: the offense of murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, and an aggravated battery to the victim before death; the offense of murder was committed against a peace officer while engaged in the performance of his official duties; and, the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest of the defendant. OCGA § 17-10-30 (b) (7), (8), (10). Brannan's motion for new trial was denied and he appeals.[1]

*General Grounds*

1. The evidence presented at trial showed the following: Andrew Brannan left his mother's house in Stockbridge, Georgia, to drive to his house in Laurens County in the afternoon of January 12, 1998. He was driving his white pickup truck 98 miles per hour on Interstate 16 when Laurens County Deputy Sheriff Kyle Dinkheller clocked his speed with a radar gun. Brannan exited the highway and stopped on a rural stretch of Whipple Crossing Road after the deputy

---

[1] The murder occurred on January 12, 1998, and the Laurens County grand jury indicted Brannan for malice murder on April 7, 1998. The State filed its notice of intent to seek the death penalty on April 30, 1998. By agreement of the parties, the indictment was dismissed and the grand jury re-indicted Brannan on October 26, 1998. After venue was transferred to Glynn County, the trial took place from January 18-30, 2000. The jury convicted Brannan on January 28, 2000, and recommended a death sentence on January 30, 2000. Brannan filed a motion for new trial on February 29, 2000, and amended it on November 9, 2000. The trial court denied the motion for new trial on July 2, 2001, and Brannan filed a notice of appeal on July 27, 2001. The case was docketed in this Court on August 24, 2001, and orally argued on November 20, 2001.

caught up to him. During the pursuit, Deputy Dinkheller activated a video camera which is aimed through his windshield. The camera captured almost all of Brannan's actions during the ensuing traffic stop. Deputy Dinkheller also wore a microphone. The deputy stopped his patrol car about 20 feet behind Brannan's truck. Brannan exited his truck and stood near the driver's side door with his hands in his pockets. The right side of Deputy Dinkheller is visible on the tape as he stood next to his driver's side door.

Deputy Dinkheller said, "Driver, step back here to me. Come on back here to me." Brannan said, "Okay," but did not move. The deputy said, "Come on back. How are you doing today?" Brannan said that he was okay and asked how the deputy was doing, but still did not move. Deputy Dinkheller said he was good and repeated, "[C]ome on back here and keep your hands out of your pockets." Brannan asked why and the deputy again said, "Keep your hands out of your pockets, sir." Brannan responded, "Fuck you, Godamit, here I am. Shoot my fucking ass." He then began dancing in the street, saying, "Here I am, here I am." The deputy ordered, "Come here. Sir, come here," but Brannan responded, "Shoot me," and kept dancing.

Deputy Dinkheller radioed for assistance on his belt-mounted radio, and the defendant stopped dancing and approached him. The deputy said, "Sir, get back." Brannan replied, "Who are you calling, motherfucker?" and then rushed the deputy and a confrontation ensued to the left of the patrol car and off camera. The deputy ordered Brannan to get back nine more times. Brannan replied with "Fuck you" four times and at one point shouted, "I am a goddam Vietnam combat veteran."

Brannan then ran back to his truck and began rummaging around behind the driver's seat. Deputy Dinkheller remained beside his patrol car and ordered, "Sir, get out of the car." The right side of the deputy is briefly visible during this time. The deputy had drawn his baton, but not his firearm. Brannan replied that he was in fear of his life. The deputy shouted, "I'm in fear of my life! Get back here now!" Brannan said, "No," and then pulled a .30 caliber M-1 carbine from his truck. The deputy radioed for help and shouted for him to put the gun down. Instead, Brannan crouched by his open driver's side door. The deputy shouted for Brannan to put the gun down three more times. Brannan opened fire and the deputy returned fire.

Deputy Dinkheller was hit and shouted, "Shoot, shoot, stop now!" Brannan continued firing and advanced to the front of the patrol car. The deputy apparently tried to take cover behind the patrol car. Brannan exhausted one magazine, reloaded, and continued firing. The microphone recorded the sounds of the deputy being shot. At trial, the medical examiner testified that by this time Deputy Dinkheller had been struck by at least nine bullets, in the arms,

legs, buttocks, chest, and head. The medical examiner opined that the deputy, although still breathing into the microphone, had lost consciousness because he was no longer returning fire or crying out when shot. The video shows Brannan cease crouching, take careful aim with his carbine, say "Die, Fucker," and fire one last shot. Brannan then fled the scene in his truck.

Brannan was found hiding in the woods about 100 yards from his house, and he made incriminating statements after his arrest. He had a gunshot wound to his abdomen. The police found the murder weapon in his house. Brannan claimed that he was not guilty by reason of insanity, and presented experts who testified that he had been unable to distinguish right from wrong because post-traumatic stress disorder had triggered a flashback to Vietnam. However, the court-appointed psychiatrist concluded that Brannan was sane, and the jury could have inferred from comments made by Brannan during the crime and after his arrest that he shot the victim because he believed the 22-year-old deputy was not showing him a sufficient amount of respect. Regarding his dancing during the altercation, Brannan explained to the police that he once defused a tense situation with an angry man by dancing and saying "shoot me." He also later told a psychiatrist that he had seen Mel Gibson act that way in the movie "Lethal Weapon." By its verdict the jury rejected Brannan's insanity defense. The evidence was sufficient to enable a rational trier of fact to find proof of Brannan's guilt of malice murder beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The trial court did not err by denying Brannan's motion for a directed verdict of acquittal. *Jackson v. Virginia*, supra; *Raulerson v. State*, 268 Ga. 623, 625 (1) (491 SE2d 791) (1997). See also OCGA § 17-9-1 (a).

## Pre-Trial Issues

2. Brannan complains that the trial court erroneously denied four of his pre-trial motions.

(a) *Motion to Exclude the Death Penalty on Account of the Arbitrary Use of Prosecutorial Discretion in the Plea Bargaining Process.* Brannan contends that the State has too much discretion in choosing to seek the death penalty or to offer a plea bargain. This contention is without merit. See *Gregg v. Georgia*, 428 U. S. 153, 199 (IV) (B) (1) (96 SC 2909, 49 LE2d 859) (1976); *Jenkins v. State*, 269 Ga. 282 (2) (498 SE2d 502) (1998). Georgia law authorizes the death penalty for Brannan's crime, and he has failed to show that the prosecutor acted in an unconstitutional manner with respect to his case. See *Jenkins v. State*, supra; *Rower v. State*, 264 Ga. 323 (1) (443 SE2d 839) (1994).

(b) *Motion to Suppress Evidence.* Brannan urges that the trial

court should have suppressed several pieces of evidence that were used against him at trial. With regard to a blood sample drawn pursuant to a search warrant, Brannan has failed to demonstrate that the hospital employee who spontaneously informed the police that Brannan's emergency room toxicology screen was positive for marijuana was acting as an agent of the State, or that the toxicology screen was for purposes other than medical diagnosis and treatment of his gunshot wound. See *Ferguson v. City of Charleston*, 532 U. S. 67 (121 SC 1281, 149 LE2d 205) (2001). The subsequent search warrant to obtain Brannan's blood sample was therefore proper and based on probable cause.

The two searches of Brannan's home were also proper. After determining the location of Brannan's house that he built by himself in the woods, the police arrived with an arrest warrant for Brannan, but could not find him in the house as he was hiding in the woods. They observed two rifles leaning against a wall, one of which was the murder weapon, and properly seized them. See *Payton v. New York*, 445 U. S. 573, 603 (IV) (100 SC 1371, 63 LE2d 639) (1980) ("[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."); *May v. State*, 181 Ga. App. 228 (1) (351 SE2d 649) (1986) (a police officer inside a suspect's home pursuant to a valid arrest warrant may seize evidence in plain view). The officers also noticed that the white pickup truck parked next to the house contained bullet holes and blood stains. They obtained a search warrant for the house and curtilage, and the resulting search of the house and truck uncovered ammunition, a shell casing, and marijuana. See *Owens v. State*, 202 Ga. App. 785 (1) (415 SE2d 704) (1992) (vehicle parked next to house considered part of the curtilage and may be searched pursuant to a search warrant for the residence). The trial court did not err by admitting the evidence obtained during these searches.

(c) *Motion to Dismiss the Case or Exclude Evidence due to Prosecutorial Misconduct.* After Brannan's arrest, the police impounded his white pickup truck and photographed the bullet holes in it. A private towing company under contract with the police then towed the truck to the company's parking lot. On May 8, 1998, Brannan filed a motion to preserve, inspect, and examine all physical evidence. In November 1998, when defense counsel asked the prosecutor about inspecting the truck, both attorneys learned for the first time that the towing company had released the truck to the lienholder, a large national bank, on May 1, 1998. The truck had been repaired and resold. Brannan filed a motion requesting dismissal of the indictment due to prosecutorial misconduct or, in the alternative, an order prohibiting the State from presenting any evidence or argument

about the truck. Brannan claimed that the failure to preserve the truck prevented his expert from determining bullet trajectories and extrapolating from the trajectories the actions of the deputy during the shooting.

"In dealing with the failure of the state to preserve evidence which might have exonerated the defendant, a court must determine both whether the evidence was material and whether the police acted in bad faith in failing to preserve the evidence." *Walker v. State*, 264 Ga. 676 (3) (449 SE2d 845) (1994). See also *Arizona v. Youngblood*, 488 U. S. 51 (109 SC 333, 102 LE2d 281) (1988). To be material, the evidence must have had an apparent exculpatory value before it was lost, and be of such a nature that the defendant cannot obtain comparable evidence by other reasonable means. *Walker v. State*, supra. The trial court held a hearing and both sides presented evidence. On the issue of bad faith, the evidence showed that the lienholder, seeking release of the truck, had phoned the DA's office, defense counsel, the GBI, and the sheriff's office. Through a series of misunderstandings, the truck was released. The key misunderstanding occurred when the GBI contacted the assistant district attorney about the need for the truck. The prosecutor stated that he did not need to look at the truck, and the GBI agent interpreted this to mean that the truck could be released. Six months later, both the prosecutor and defense counsel were surprised to learn that the bank had repossessed the truck. On the issue of materiality, two crime scene experts testified that an examination of the five bullet holes in the truck could not reveal who fired first, the distance the deputy was from the truck, or whether the deputy was advancing or retreating. Furthermore, one of the experts testified that it would be impossible to put the truck back in the exact position it was in during the shooting in order to determine accurate bullet trajectories. The trial court found no due process violation in the release of the truck, due to a lack of bad faith on the part of the State and a lack of exculpatory value in the truck. See *Arizona v. Youngblood*, supra; *Walker v. State*, supra. For the same reasons, the trial court also determined that the State had not violated its discovery obligations under OCGA § 17-16-4. The trial court did not err in denying the motion to dismiss or to exclude evidence.

(d) *Motion to Present Mitigating Evidence Concerning the Death Penalty.* Brannan asserts that the trial court erred by refusing to allow him to present penalty phase evidence about the death penalty in general, including subjects such as international treaties, the abolition of the death penalty in other countries, religious teachings, and the method of execution. The trial court properly denied this motion. See *Barnes v. State*, 269 Ga. 345 (27) (496 SE2d 674) (1998); *Franklin v. State*, 245 Ga. 141 (7) (263 SE2d 666) (1980) (proper mitigating evi-

dence involves evidence about the particular defendant and not evidence about the death penalty in general).

3. The trial court ordered a change of venue to Glynn County for trial. After Brannan's trial, newspaper articles reported that Glynn County experienced difficulty in the compilation of jury lists after switching to a new jury selection computer program. Brannan challenged the traverse jury list, but the evidence showed that the list from which prospective jurors were selected for his trial was created under the "old" program. The evidence did not support Brannan's allegation that the array was vitiated by the failure to purge felons, the deceased, and the mentally incompetent from the traverse jury list. See OCGA §§ 15-12-40, 15-12-40.2, 15-12-42. Moreover, the challenge to the traverse jury array was untimely. See *Clark v. State*, 255 Ga. 370 (2) (338 SE2d 269) (1986). We find no error.

4. A month before trial, the State filed a notice of its intent to present non-statutory aggravating circumstances involving several incidents that occurred while Brannan was in jail awaiting trial. Contrary to his contention, this notice and the supplement to the witness list were not untimely. See OCGA §§ 17-10-2, 17-16-8 (a); *Terrell v. State*, 271 Ga. 783 (12) (523 SE2d 294) (1999). The trial court did not abuse its discretion by denying a motion for a continuance filed by Brannan. See *Johnson v. State*, 271 Ga. 375 (8) (519 SE2d 221) (1999).

## *Jury Selection*

5. Brannan contends that the State violated *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986), by discriminating on the basis of race during jury selection. The State used seven of its ten peremptory strikes to remove African-American prospective jurors from the panel. There were eleven African-Americans on the panel before jury selection, and three African-Americans served on the jury. The State gave reasons for the seven peremptory strikes, rendering a preliminary showing of prima facie discrimination moot. *Hernandez v. New York*, 500 U. S. 352, 359 (II) (A) (111 SC 1859, 114 LE2d 395) (1991); *Lewis v. State*, 262 Ga. 679 (2) (424 SE2d 626) (1993). The trial court ruled that Brannan did not meet his burden of showing that the State acted with discriminatory intent. This ruling will be affirmed unless clearly erroneous. *Turner v. State*, 267 Ga. 149 (2) (476 SE2d 252) (1996).

Five of the prospective jurors expressed reservations about imposing the death penalty, in addition to other valid race-neutral reasons, such as being previously charged with a criminal offense, claiming hardship due to bankruptcy or physical disability, or having a relative currently facing criminal prosecution. See *Jenkins v. State*,

supra at 290 (11); *Sears v. State*, 268 Ga. 759 (8) (493 SE2d 180) (1997). The sixth prospective juror learned in nursing school about post-traumatic stress disorder, which was to figure prominently in Brannan's defense, and the district attorney's office had previously prosecuted her for fraud. These were valid race-neutral reasons for the State to strike her. See *Jenkins v. State*, supra; *Jackson v. State*, 265 Ga. 897 (2) (463 SE2d 699) (1995) (" 'Unless a discriminatory intent is inherent in the . . . (proponent's) explanation, the reason offered will be deemed race neutral.' [Cit.]"). The seventh prospective juror served four years in the Marine Corps in the 1960's, including a tour in Vietnam as a truck driver. He said that he had known Marines with post-traumatic stress disorder ("PTSD") who would "freak out" or "snap," and that he knew they had PTSD because "the corpsman said they had [it]." The State explained that a white Vietnam veteran they did not strike was not similarly situated. That prospective juror had served 21 years in the Marine Corps as a sergeant, including a combat tour in Vietnam in the infantry, and, when asked about PTSD, said, "I ain't never had the problem with that." The trial court did not err by finding that this reason was race-neutral. See *Jackson v. State*, supra; *Foster v. State*, 272 Ga. 69 (5) (525 SE2d 78) (2000). Since Brannan failed to carry his burden of proving purposeful discrimination by the State during jury selection, this enumeration of error is without merit.

6. Brannan further contends that the trial court erred by failing to excuse for cause three prospective jurors who were allegedly biased in favor of the death penalty. See *Wainwright v. Witt*, 469 U. S. 412 (105 SC 844, 83 LE2d 841) (1985); *Greene v. State*, 268 Ga. 47 (485 SE2d 741) (1997). "The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment 'is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' [Cit.]" *Greene v. State*, supra at 48 (quoting *Wainwright v. Witt*, supra at 424 (II)). As a general proposition, a prospective juror is not disqualified "merely because he states that he is leaning for or against a death sentence." *Mize v. State*, 269 Ga. 646 (6) (d) (501 SE2d 219) (1998). "The relevant inquiry on appeal is whether the trial court's finding that a prospective juror is disqualified is supported by the record as a whole." *Greene v. State*, supra at 49. An appellate court must pay deference to a trial court's finding that a prospective juror is qualified or disqualified, which includes the trial court's resolution of any equivocations or conflicts in the responses on voir dire. *Greene v. State*, supra. "Whether to strike a juror for cause is within the discretion of the trial court and the trial court's rulings are proper absent some manifest abuse of discretion." *Greene v. State*, supra at 50.

Although all three prospective jurors expressed a preference for the death penalty for a convicted murderer, and one of them also expressed a reluctance to impose life imprisonment with the possibility of parole, they indicated that they could vote for all three possible sentences and consider mitigating evidence. See *Greene v. State*, supra at 48-50. One prospective juror, whose daughter worked as an agent for the Department of Justice, responded in the negative when asked an awkwardly-phrased question about whether it was fair to a person charged with the murder of a police officer to have her on the jury. However, the trial court's determination of this prospective juror's qualification was not limited to her opinion of her own impartiality. See *Raulerson v. State*, supra at 629 (4); *Burgess v. State*, 264 Ga. 777 (7) (450 SE2d 680) (1994). Her other responses showed her to be qualified. See *Greene v. State*, supra. Two of the prospective jurors also expressed skepticism about an insanity defense, but indicated that they could consider such a defense. We conclude that the trial court did not abuse its discretion by finding that these three prospective jurors were qualified to serve.

Brannan also argues that the trial court improperly "rehabilitated" these prospective jurors by asking them questions designed to ensure that they were qualified. See *Walker v. State*, 262 Ga. 694 (2) (424 SE2d 782) (1993); *Cannon v. State*, 250 Ga. App. 777 (1) (552 SE2d 922) (2001); *Walls v. Kim*, 250 Ga. App. 259 (549 SE2d 797) (2001). The voir dire transcript does not support this argument. This Court and the United States Supreme Court have long recognized that ascertaining prospective jurors' views on the death penalty is no easy task. See *Wainwright v. Witt*, supra at 424-425 (II) ("What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings."); *Spivey v. State*, 253 Ga. 187, 197, fn. 3 (319 SE2d 420) (1984). Many prospective jurors have given little thought to capital punishment and are unfamiliar with the procedures of a death penalty trial and the jury's role in the sentencing determination. See *Nance v. State*, 272 Ga. 217 (6) (526 SE2d 560) (2000); *Spivey v. State*, supra. For this reason, prospective jurors, some of whom are struggling to formulate and articulate their views for the first time, may give confusing or equivocal responses to the lawyers' questions. See *Spivey v. State*, supra (prospective jurors in death penalty cases will frequently provide answers which are confusing, ambiguous, and contradictory because they have never before been required to formulate and express their views on the death penalty). Under these circumstances, the trial court may ask questions, as it

did in Brannan's case, designed to clarify the prospective juror's views before ruling on qualification. The trial court's questions in this case were not an attempt to achieve a desired answer, but rather were a "neutral attempt to determine the juror's impartiality." *Walker v. State*, supra at 696 (2). The record as a whole shows these jurors to be properly qualified. See *Greene v. State*, supra. Compare *Cannon v. State*, supra at 779-780. Accordingly, we find no error.

7. During the voir dire of prospective juror Lampkin, defense counsel asked him if he was aware that jurors would have to vote individually for a death sentence. Mr. Lampkin replied, "Yes, that's what everybody in the back was talking about." Defense counsel followed up by asking, "Any particular discussions about what life sentences or death sentences mean or what the process is among these fifteen or sixteen folks [on your jury panel]?" Mr. Lampkin said, "No, I'm the one who brought it up." Brannan objected that the 16 prospective jurors on that jury panel had discussed the case in violation of the trial court's instructions. He requested that the jury panel be questioned on this subject. The remaining 15 prospective jurors were brought into the courtroom and questioned about whether there had been any discussions about the case. Only prospective juror Tucker, an attorney, responded affirmatively. He was separately questioned and stated that Mr. Lampkin had said, "[W]e're here on the fellow who shot the police officer over in Laurens County, or Dublin." Mr. Tucker said that at that point he told Mr. Lampkin that he was not supposed to form an opinion yet. There were no other discussions about the case. Mr. Tucker said, "I don't think any of these folks are tainted. Nobody has expressed an opinion about . . . the death penalty or anything of that nature." When individually questioned by the trial court, each juror stated that he or she could put aside anything said in the jury room and decide the case based solely on the evidence and the trial court's instructions. We conclude that Brannan has failed to demonstrate juror misconduct sufficient to upset the verdict. See *Holcomb v. State*, 268 Ga. 100 (2) (485 SE2d 192) (1997); *Todd v. State*, 261 Ga. 766 (5) (410 SE2d 725) (1991). The alleged statements did not involve deliberation or any discussion of the merits of the case and were harmless beyond a reasonable doubt. See *Holcomb v. State*, supra. In fact, the trial court, in its instructions to all the prospective jurors at the beginning of voir dire, covered the substance of the alleged statements: that the case was from Laurens County, that Brannan was charged with the murder of a police officer, and that the State was seeking the death penalty.

8. The trial court did not improperly restrict Brannan's voir dire questioning of prospective jurors. See *Gissendaner v. State*, 272 Ga. 704 (4) (532 SE2d 677) (2000); *Barnes v. State*, supra at 351-352 (10). "The scope of voir dire is largely left to the trial court's discretion,

and the voir dire in this case was broad enough to ascertain the fairness and impartiality of the prospective jurors." *Barnes v. State,* supra.

9. Brannan complains that the trial court erroneously excused seven prospective jurors for cause. Six of these were properly excused because they firmly and repeatedly stated that, regardless of the evidence and the trial court's instructions, they could not vote to impose a death sentence. See *Greene v. State,* supra at 48-50. The remaining prospective juror was excused for cause on Brannan's motion. Assuming that the juror was qualified, such invited error is not grounds for reversal. See *Barnes v. State,* supra at 356 (19). This enumeration is without merit.

10. The death qualification of prospective jurors is not unconstitutional. *DeYoung v. State,* 268 Ga. 780 (11) (493 SE2d 157) (1997).

### The Guilt-Innocence Phase

11. Brannan claims that the trial court erred by allowing testimony from a Central State Hospital psychiatrist, Dr. Carter, who evaluated Brannan pursuant to a court order because he intended to raise an insanity defense. See OCGA § 17-7-130.1. He argues that Dr. Carter was biased in favor of the State and, therefore, that he was not the neutral court-appointed expert contemplated by OCGA § 17-7-130.1. See *Tolbert v. State,* 260 Ga. 527, 528 (397 SE2d 439) (1990) ("A court-appointed medical expert cannot be classified as an agent of the state, but must be considered as an independent and impartial witness."). The basis for this argument was the allegation that Dr. Carter cooperated with the State in turning over records from his pre-trial evaluation of Brannan, including an audiotape of an interview, but refused to cooperate with the defense by turning over the same materials to them. At the beginning of trial, the assistant district attorney relayed a request from Dr. Carter that he be allowed to sit in the courtroom during the testimony of the defense experts so that he "can assist us in cross-examination, as well as . . . testify more fully himself." The trial court refused this request and expressed concern that Dr. Carter was only supposed to report what he found in his examination. After Brannan objected and sought to exclude Dr. Carter's testimony on the grounds of bias, the trial court stated that it would hold a hearing on this issue before Dr. Carter testified.

During the hearing, Dr. Carter explained that he heard that Brannan had hired an expert on post-traumatic stress disorder. A colleague told him that he might be asked to "take the role of a rebuttal witness," so he called to see if he could sit in during the trial since he had no reports available. When responding to a question by

defense counsel about this phone request, Dr. Carter stated, "My understanding only had to do with any information I might need to help my – to help further validate any testimony that I might give. It wasn't intended for the purpose of assisting anyone." He said that he called the DA's office because "we try not to bother the judge unless it's necessary" and he believed the DA would relay the request to the judge. When the judge reminded him that he was just to give his facts and opinions and not favor any side, Dr. Carter replied, "That's, you know, that's the nature of my work. That's my moral and ethical duty. I'd never do otherwise." Dr. Carter further explained, with regard to Brannan's difficulty in obtaining records before trial from Dr. Carter's evaluation, that the hospital legal department, and not he, handles requests for documents. In fact, Dr. Carter called defense counsel after receiving a subpoena to "find out what I needed to bring because I'm not in control of the medical records." Despite the apparent discovery confusion, defense counsel received before trial Dr. Carter's report, his handwritten notes, and a transcript of his interview with Brannan. The trial court denied Brannan's motion to bar Dr. Carter's testimony after finding that he would be fair and impartial. This ruling was not error, and Brannan was able to cross-examine Dr. Carter with regard to possible bias. See OCGA § 24-9-64; *Moore v. State*, 220 Ga. App. 434 (3) (469 SE2d 211) (1996). Brannan also argues that Dr. Carter testified that Brannan was sane during the crime even though the defense presented evidence that he was not. However, a court-appointed expert does not become "biased" because he arrives at a conclusion that conflicts with a party's position.

12. Deputy Don Matecun, a friend of the victim, was the first law enforcement officer to arrive at the murder scene. In the guilt-innocence phase, he testified about finding the victim lying in the road with a female passerby trying to help him. After being shown a crime scene photograph, Deputy Matecun began crying and the prosecutor stopped questioning him and allowed him to leave. Brannan objected to the deputy's emotional display and moved for a mistrial, claiming that the State had put the deputy on the stand for the purpose of making him cry before the jury. In support of this claim, he alleged that the deputy could also be heard crying on the portion of the videotape not shown to the jury. The prosecutor responded that Deputy Matecun was a relevant witness because he was the first officer at the scene, and that he did not react emotionally when shown the crime scene photograph before trial. "Demonstrations and outbursts which occur during the course of a trial are matters within the trial court's discretion unless a new trial is necessary to insure a fair trial." *Dick v. State*, 246 Ga. 697 (14) (273 SE2d 124) (1980). Although the witness cried, there is no evidence that he became hys-

terical or made any prejudicial comments. *Dick v. State*, supra. The trial court did not abuse its discretion by denying the motion for a mistrial. See *Dick v. State*, supra.

13. The trial court did not err by admitting photographs of the victim and the crime scene. The photographs were relevant and admissible to show the nature and location of the wounds on the victim's feet, legs, buttocks, arms, torso, and head caused by being struck by ten bullets, and the location of the victim's body in relation to crime scene evidence such as shell casings, blood stains, and the patrol car. See *Barnes v. State*, supra at 357 (25).

14. While cross-examining a GBI crime scene specialist, Brannan asked whether the blood spatter and the location of blood stains around the victim indicated that he had remained in a fairly confined area during the shooting since there were no blood stains on the road more than seven feet away from the body. During examination of the following police witness, the prosecutor sought to admit the victim's blood-stained uniform pants to show that they were made from a material that may have soaked up blood from a wound, thereby inhibiting the flow of blood onto the ground. The trial court did not err by admitting the pants over defense objection. See *Baker v. State*, 246 Ga. 317 (3) (271 SE2d 360) (1980) (the admission of evidence is a matter which rests largely within the trial court's discretion).

After the pants were admitted, defense counsel objected and moved for a mistrial, asserting that the victim's mother silently doubled over in pain when the pants were displayed and that ten jurors looked at her while she reacted. The trial court denied the motion and issued the following curative instruction:

> Ladies and gentlemen of the jury, let me give you this short instruction. Before you were brought in the room this morning, I admonished any family members or spectators not to show any emotion or outcry or any demonstration whatsoever during the presentation of the evidence and during this trial.

> There may have been some reaction to this exhibit, and I just want you, as jurors, to not be affected in any way whatsoever from any reaction from the audience, and I've asked that it not happen, and . . . if there's anyone who can't control their emotions or whatever, I'll ask that they leave the courtroom and not try to influence the jurors in any way whatsoever.

Under these circumstances, the curative instruction was sufficient to cure any error resulting from the alleged reaction of a spectator to the display of the victim's pants. See *Lowe v. State*, 267 Ga. 410 (3)

(478 SE2d 762) (1996). The trial court did not err by denying Brannan's motion for mistrial. *Lowe v. State*, supra; *Byrd v. State*, 262 Ga. 426 (1) (420 SE2d 748) (1992).

15. Before trial, the trial court ordered that the videotape of the murder be stopped at a certain point so that the jury would not hear the reactions of passersby and police officers arriving at the murder scene. As the prosecutor was setting up the equipment to play the tape, the trial court asked, "Has the tape been set to stop at the appropriate place, Mr. Larsen?" The prosecutor responded that he was going to oversee that. The trial court reminded, "I would ask that you arrange where it can be stopped if it doesn't do it automatically." Brannan objected and moved for a mistrial, claiming that the trial court's remarks would cause the jurors to speculate about the portion of the tape they would not see. We conclude that the trial court did not err by denying the motion because its innocuous comments about stopping the tape could not have prejudiced Brannan. In addition, the trial court instructed the jury that those comments were an attempt "to operate the Court in an orderly manner and move it along" and that they were to disabuse their minds of those comments and "just view the tape and draw whatever you would draw from it." This enumeration is without merit.

16. Although Brannan contends that the videotape of the murder was emotionally charged and prejudicial, it was evidence in the case and the prosecutor could properly show it during the guilt-innocence phase closing argument. See *Brown v. State*, 268 Ga. 354 (8) (490 SE2d 75) (1997) (counsel in closing argument may replay a portion of a videotape admitted into evidence).

17. Brannan complains about certain statements made by the prosecutor during the guilt-innocence phase closing argument. Brannan asserts that it was improper for the prosecutor to disparage his insanity defense. However, Brannan did not object to the prosecutor's criticism of his insanity defense during trial and, therefore, this issue is waived on appeal with regard to guilt. See *Gissendaner v. State*, supra at 713 (10) (b); *Miller v. State*, 267 Ga. 92 (2) (475 SE2d 610) (1996). Moreover, it is not improper for a prosecutor to take issue with the findings and conclusions of defense experts during closing argument.

At one point, while arguing that perceived lack of respect was the motive for the murder, the prosecutor argued that Brannan was like Lucifer when he was kicked out of heaven and became the Devil. The prosecutor said that Brannan wanted respect when he left the Army, but was not getting it, and that he was determined to get it from the victim. Brannan did not object to this argument at the time it was made or at the conclusion of the closing argument. His objection was not made until after the trial court's charge and, thus, was

not timely. See *Butler v. State*, 273 Ga. 380 (8) (541 SE2d 653) (2001). Even if the objection was timely, the prosecutor's analogy, when viewed in context, would not provide a basis for the reversal of the murder conviction. See *Simmons v. State*, 266 Ga. 223 (6) (b) (466 SE2d 205) (1996) (flights of oratory and figurative speech are permissible during closing argument). For the same reasons, the trial court did not err in overruling the defense objection that the prosecutor called the victim brave and kind due to his actions during the traffic stop. See *Butler v. State*, supra; *Simmons v. State*, supra. Because none of these arguments was improper, we need not determine whether there was a reasonable probability that they changed the result of the sentencing phase. *Carruthers v. State*, 272 Ga. 306 (11) (528 SE2d 217) (2000); *Hicks v. State*, 256 Ga. 715 (23) (352 SE2d 762) (1987). See also OCGA § 17-10-35 (c) (1).

18. The trial court instructed the jury, "Every person is presumed to be of sound mind and discretion, but this presumption may be rebutted." See OCGA § 16-2-3. This presumption of sanity is not unconstitutionally burden-shifting. See *Parker v. State*, 256 Ga. 363 (1) (349 SE2d 379) (1986). A lengthy charge on the defense of insanity followed. We find no error in the guilt-innocence phase jury charge.

19. OCGA § 16-5-1 is constitutional. *Speed v. State*, 270 Ga. 688 (48) (512 SE2d 896) (1999).

## The Sentencing Phase

20. Brannan contends that the trial court erred in allowing the State to present victim-impact evidence. This type of evidence is constitutional and generally admissible. See *Pickren v. State*, 269 Ga. 453 (1) (500 SE2d 566) (1998); *Livingston v. State*, 264 Ga. 402 (1) (c) (444 SE2d 748) (1994). Before the victim's widow read her brief written statement to the jury, the trial court reviewed it and ordered several redactions of material that might be considered inflammatory or unduly prejudicial. See *Turner v. State*, 268 Ga. 213 (2) (a) (486 SE2d 839) (1997). The statement was not improper. See *Turner v. State*, supra at 215-216 (2) (b); *Simpkins v. State*, 268 Ga. 219 (3) (486 SE2d 833) (1997). Furthermore, there is no indication in the record that the sentencing phase witnesses for the State showed excessive emotion, and the trial court is not required to issue a prophylactic order against displays of emotion. See *Jones v. State*, 267 Ga. 592 (2) (b), (c) (481 SE2d 821) (1997). We find no error in the victim-impact evidence.

21. The State called Rickey Horne, a Baldwin County detective and former security officer at the Binion Building at Central State Hospital in Milledgeville. The Binion Building houses patients who

are facing criminal charges and are sent to Central State to be mentally evaluated by the psychiatric staff. It also houses people found not guilty by reason of insanity and some inmates who were found guilty but mentally ill. Detective Horne began to discuss the lax security measures at the Binion Building. Brannan objected and moved for a mistrial on the ground that he did not receive pre-trial notice of this evidence in aggravation. See OCGA § 17-10-2. The trial court sustained Brannan's objection and ordered the witness to step down. The trial court instructed the jury, "I ask that you disregard any evidence from this witness, not consider it in making your verdict whatsoever. Don't have it – let it have any effect on you and disabuse your mind from it." We conclude that the trial court's instructions cured any harm resulting from the brief, irrelevant testimony of this witness. The trial court did not abuse its discretion by denying the motion for mistrial. See *James v. State*, 270 Ga. 675 (4) (513 SE2d 207) (1999).

22. Brannan urges that the prosecutor made several improper arguments that require the reversal of the death sentence.

(a) *Insinuating that a life sentence burdens taxpayers.* The prosecutor stated that Brannan should pay for his acts, and then argued, "And not by saying, let's put him in the penitentiary and leave him there and let him eat and let him breathe and let him read and let him play and let him play ping pong and let him do push ups and let him grow fat off our land." Brannan objected and moved for a mistrial. The trial court sustained the objection, admonished the prosecutor, and instructed the jury to disregard the argument. The trial court's instruction cured any possible harm from the argument, even assuming that it was improper. See *Pace v. State*, 271 Ga. 829 (32) (b), (d) (524 SE2d 490) (1999); *Williams v. State*, 258 Ga. 281 (7) (368 SE2d 742) (1988). The trial court did not abuse its discretion by denying the motion for mistrial. See *James v. State*, supra.

(b) *Arguments concerning the victim.* The prosecutor argued that the victim was a police officer who did a difficult job for little pay, that he remained respectful and did not swear once during the altercation, and that he was a hero and a peacekeeper. These arguments were not improper and, therefore, we conclude that no harm was suffered by Brannan, who did not object during or after the prosecutor's penalty phase closing argument. See *Gissendaner v. State*, supra at 715 (13).

(c) *Arguments concerning the worth or status of Brannan.* In the context of arguing the devotion of police officers to their job, the prosecutor stated that Deputy Dinkheller was being paid only $52 a day. The prosecutor also said that Brannan was receiving almost $2,000 a month in disability payments for claiming to suffer from post-traumatic stress disorder. Both amounts are taken directly from the

evidence. On appeal, Brannan contends that the prosecutor was comparing the worth and status of the defendant and the victim when arguing for a death sentence. See *Ingram v. State*, 253 Ga. 622 (10) (323 SE2d 801) (1984). However, Brannan did not object to this argument until after the trial court's penalty phase jury charge. The objection was therefore untimely. *Butler v. State*, supra. Accordingly, the standard of review to be applied is whether there was a reasonable probability that the argument, if improper, changed the jury's exercise of discretion in choosing between life imprisonment or death. See *Hicks v. State*, supra at 730 (23). We conclude that there was no such reasonable probability because, when viewed in context, the prosecutor's statements did not urge the imposition of the death penalty based upon wealth or social status. See *Hicks v. State*, supra; *Ingram v. State*, supra.

(d) *Descriptions of the defendant.* Brannan complains that the prosecutor described him as a coward, a beast, and an animal, and as wicked and evil. Brannan did not object to these arguments when they were made, and we conclude that these descriptions did not, in reasonable probability, alter the jury's discretion when choosing between life imprisonment or death. See *Hicks v. State*, supra. Even if objected to in a timely fashion, the metaphorical characterizations would not be reversible error. See *Simmons v. State*, supra.

23. The sentencing phase jury charge was proper. The trial court adequately charged on mitigating circumstances and instructed the jurors that they could impose a life sentence for any reason or no reason. The trial court is not required to charge the jury on specific mitigating circumstances or to instruct that there need not be unanimity in determining their existence. *Terrell v. State*, supra at 788 (11); *Jenkins v. State*, supra at 296.

24. The trial court instructed the jury to select their sentencing verdict on the verdict form with a check mark and then "X" out the two options they did not choose. When the trial court received the completed verdict form indicating a death sentence, the other two options had not been crossed out. The trial court asked the foreman to "X" out the two options not chosen, which the foreman did in the courtroom. On appeal, Brannan contends that the failure to return the jury to the jury room to complete the verdict form was reversible error. However, any confusion over the verdict form was inconsequential and harmless to the defendant. The jury clearly selected the death penalty on the verdict form, and no deliberation remained to be conducted. The jury was twice polled as to its verdict and all indicated that they voted for a death sentence. We find no error.

25. Brannan's enumeration regarding the constitutionality of execution by electrocution is moot. *Dawson v. State*, 274 Ga. 327 (554 SE2d 137) (2001).

26. The Georgia statutes providing for the imposition of the death penalty are not unconstitutional. *Pruitt v. State*, 270 Ga. 745 (6) (514 SE2d 639) (1999).

27. The Unified Appeal Procedure is not unconstitutional. *Heidler v. State*, 273 Ga. 54 (24) (537 SE2d 44) (2000).

28. The death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1). The evidence was sufficient to authorize the jury to find beyond a reasonable doubt the three statutory aggravating circumstances which supported the death sentence for the murder. OCGA § 17-10-35 (c) (2); *Jackson v. Virginia*, supra. Considering both the crime and the defendant, the death sentence is not disproportionate to the penalty imposed in similar cases. OCGA § 17-10-35 (c) (3). In addition to the evidence of the murder, which included the videotaped depiction of Brannan deliberately shooting a wounded, unconscious police officer, the State presented evidence that Brannan had shot in the direction of his neighbor during an altercation, and fashioned a crude weapon in jail using a razor blade. The similar cases listed in the Appendix support the imposition of the death penalty in this case, in that all involve the murder of a police officer in the performance of his official duties.

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Holsey v. State*, 271 Ga. 856 (524 SE2d 473) (1999); *Speed v. State*, 270 Ga. 688 (512 SE2d 896) (1999); *Henry v. State*, 269 Ga. 851 (507 SE2d 419) (1998); *Davis v. State*, 263 Ga. 5 (426 SE2d 844) (1993); *Hill v. State*, 250 Ga. 277 (295 SE2d 518) (1982); *Wallace v. State*, 248 Ga. 255 (282 SE2d 325) (1981); *Stevens v. State*, 247 Ga. 698 (278 SE2d 398) (1981); *McCleskey v. State*, 245 Ga. 108 (263 SE2d 146) (1980); *Collier v. State*, 244 Ga. 553 (261 SE2d 364) (1979).

DECIDED MARCH 25, 2002 —
RECONSIDERATION DENIED APRIL 10, 2002.

*Taylor & Viers, Richard T. Taylor, Michael Mears, Thomas H. Dunn*, for appellant.

*Ralph M. Walke, District Attorney, Peter F. Larsen, Louie C. Fraser, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Allison B. Vrolijk, Romin Alavi, Assistant Attorneys General*, for appellee.