## S13P0210. EDENFIELD v. THE STATE.
(744 SE2d 738)

BLACKWELL, Justice.

David Edenfield was tried by jury, convicted of murder and several other serious crimes — all in connection with the brutal sexual assault and death of six-year-old Christopher Barrios — and sentenced to death for the murder. Following the denial of his motion for new trial, Edenfield appeals, raising several claims of error. We, however, see no reversible error, and for that reason, we affirm.[1]

---

[1] The events that form the basis for the convictions occurred on March 8, 2007. Edenfield was indicted on March 21, 2007 and charged with murder, kidnapping with bodily injury, false imprisonment, two counts of aggravated child molestation, child molestation, enticing a child for indecent purposes, cruelty to children in the first degree, concealing the death of another, and tampering with evidence. One week later, the State gave notice of its intent to seek a sentence of death. On September 21, 2009, trial commenced, and in the course of the trial, the State withdrew the kidnapping and enticing charges. The jury returned its verdict as to guilt on October 5, 2009, finding Edenfield guilty of all of the remaining charges. The next day, the jury returned its verdict as to sentence, recommending death, and the trial court imposed a sentence of death for the murder. See OCGA § 17-10-31 (a) ("Where a statutory aggravating circumstance is found and a recommendation of death is made, the court shall sentence the accused to death."). As to the other charges, the trial court merged the cruelty to children in the first degree into the murder, imposed a sentence of imprisonment for life for one count of aggravated child molestation, and imposed consecutive sentences of imprisonment for life for the other count of aggravated child molestation, imprisonment for a term of twenty years for child molestation, imprisonment for a term of ten years for false imprisonment, imprisonment for a term of ten years for concealing the death of another, and imprisonment for a term of three years for tampering with evidence. Edenfield filed a motion for new trial on November 4, 2009, and he amended it on December 23, 2009 and again on April 21, 2010. Following a hearing, the trial court denied the amended motion for new trial on October 28, 2010. Edenfield timely filed a notice of appeal on November 29, 2010, and the case was docketed in this Court for the April

*Sufficiency of the Evidence*

1. We turn first to the contention that the evidence cannot sustain the convictions. Viewed in the light most favorable to the verdict, the evidence shows that Christopher lived with his father ånd stepmother in a Glynn County mobile home park, and his grandmother lived nearby, also in the mobile home park. Edenfield lived with his wife, Peggy, and his adult son, George,[2] in the same mobile home park, across the street from the grandmother.

On the afternoon of March 8, 2007, around 2:45 p.m., Christopher returned home from school, and he went to see his grandmother. He stayed with his grandmother for about 30 minutes, and then he went back to his own home to get some toys, including a "lightsaber." Around 3:30 p.m., a neighbor saw Christopher on his front porch, playing with toys. Later, around 6:00 p.m., the same neighbor saw Christopher again, playing with toys in a yard down the road. About fifteen minutes after that, another neighbor saw Christopher skipping toward his home, smiling and carrying a toy sword. Around the same time, his stepmother discovered that Christopher was no longer with his grandmother, and she began to search for him, eventually calling for his father to leave work early and join the search. When the search failed to turn up any sign of Christopher, his father called upon law enforcement officers.

That evening, around 9:00 p.m., a police investigator saw a "lightsaber" in the yard of the Edenfield home, and he observed the occupants of that home furtively peeking out the windows.[3] The investigator knocked on the door, and when Peggy answered, the investigator saw a man — later identified as Donald Dale, a friend of the Edenfield family — who seemed to be trying to hide in the home. The investigator asked the Edenfield family and Dale to step onto the porch and speak with him. They did, although the investigator noticed that, whenever he tried to ask George a question, Edenfield or Peggy would answer for him. Eventually, the investigator asked George to walk to the road with the investigator, and there, George told the investigator that the devil had told him to kill Christopher. George was taken to a law enforcement office for an interview, and he

---

2012 term. The case subsequently, however, was remanded to the trial court for the appointment of new counsel, and after the case was returned to this Court, it was docketed again, this time for the January 2013 term. The case was argued in this Court on January 16, 2013.

[2] George was mentally disabled and had the cognitive ability of a five year old. He also was a convicted child molester.

[3] Other neighbors were helping with the search for Christopher.

was later arrested. Edenfield himself was arrested five days later and charged with helping George dispose of the body.

On March 15, Department of Natural Resources officers found some plastic trash bags in a wooded area in Glynn County. Christopher's body was inside the bags. According to the medical examiner, Christopher had been anally raped and strangled. In addition, Christopher had been bitten on his back, and chemical analysis revealed saliva on his back, buttocks, and penis. Moreover, seminal fluid was discovered in the plastic bags in which Christopher was found.

Law enforcement officers interviewed Edenfield several times, but he gave his most significant and inculpatory statement on March 16, three days after he was arrested for helping to dispose of the body. In that statement, Edenfield admitted that he helped to hold Christopher down as George penetrated the child with his penis, both orally and anally. Edenfield also admitted that he rubbed his own penis against Christopher and that he ejaculated on the child, although he denied personally committing any other sexual assaults upon Christopher. During these sexual assaults, Edenfield said, Peggy watched and masturbated, and Christopher fought to escape, begged them to stop, and threatened to tell his family. Following the sexual assaults, George began to strangle Christopher. At some point, Edenfield admitted, he put his own hands over George's hands to see what it would feel like to participate in a killing.[4] After Christopher was strangled, Edenfield said, he, Peggy, George, and Donald Dale put Christopher in plastic trash bags and dumped his body. At trial, Peggy testified, and she confirmed that Edenfield had participated in the sexual assaults, the murder, and the disposal of the body. She added that Edenfield had helped to undress Christopher, that Edenfield had put his mouth on Christopher's penis, and that Edenfield had attempted to put his penis into Christopher's anus.

Pointing to conflicts in the evidence, Edenfield argues that it is insufficient to sustain his convictions. Although the evidence may be inconsistent in some respects, "we must view the evidence in the light most favorable to the verdict and leave questions of credibility and the resolution of conflicts in the evidence to the jury." *Bradley v. State*, 292 Ga. 607, 609 (1) (a) (740 SE2d 100) (2013). So viewed, we have no difficulty concluding that the evidence was sufficient to authorize a rational jury to find beyond a reasonable doubt that Edenfield was guilty of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560)

---

[4] Edenfield admitted as well that he found it exciting to participate in a killing.

(1979). See also Unified Appeal Procedure ("UAP") IV (B) (2) (providing that, in all death penalty cases, this Court will determine whether the verdicts are supported by the evidence). Accordingly, the evidence sustains the convictions.

### Pretrial Issues

2. We turn next to the contention that the trial court erred when it denied a pretrial motion to suppress several statements that Edenfield gave to investigators, including not only his statement of March 16, 2007, but also statements that he gave before he was arrested. Edenfield claims that his statements were involuntary because they were induced by "hope of benefit," and he cites former OCGA § 24-3-50, which provided that, "[t]o make a confession admissible, it must have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." But see former OCGA § 24-3-51 ("The fact that a confession has been made under a spiritual exhortation, a promise of secrecy, or a promise of collateral benefit shall not exclude it.").[5] In support of his claim, Edenfield says that he was induced to give statements to investigators by their assurances that, if only he told the "truth," he could go home and remain free to care for his elderly mother, that a true account of what George had done could help George to get mental health treatment, and that the investigators would help Edenfield by asking his landlord not to evict him.

A statement given by an accused to law enforcement is admissible against him only if the statement was voluntary, and in Georgia, that means that the statement must not have been induced by "hope of benefit," among other things. See former OCGA § 24-3-50. As we have explained before, a "hope of benefit" arises from "promises related to reduced criminal punishment — a shorter sentence, lesser charges, or no charges at all." *Brown v. State*, 290 Ga. 865, 868-869 (2) (b) (725 SE2d 320) (2012). See also *White v. State*, 266 Ga. 134, 135 (3) (465 SE2d 277) (1996) ("The promise of a benefit that will render a confession involuntary under [former] OCGA § 24-3-50 must relate to the charge or sentence facing the suspect."). "A promise not relating to charges or sentences, including a promise regarding release after questioning, has been held to constitute only a collateral benefit . . .

---

[5] As we have noted before, the provisions of former OCGA § 24-3-50 and former OCGA § 24-3-51 must be read together. See *Brown v. State*, 290 Ga. 865, 868 (2) (b) (725 SE2d 320) (2012). The provisions of both former Code sections were carried forward into the new Evidence Code, where they were recodified as a single Code section, OCGA § 24-8-824. Because the new Evidence Code was effective only as of January 1, 2013, however, it does not apply in this case, and for that reason, we cite the old Code sections.

and even if it induces a confession, it does not require the automatic exclusion of that evidence." *Brown*, 290 Ga. at 869 (2) (b) (citations and punctuation omitted). When a court considers whether a statement was voluntary, it must look to the totality of the circumstances, and at trial, the State bears the burden of proving by a preponderance of the evidence that a statement was, in fact, voluntary. See *Bunnell v. State*, 292 Ga. 253, 255 (2) (735 SE2d 281) (2013). See also *Smiley v. State*, 271 Ga. 734, 735-736 (4) (524 SE2d 234) (1999). On appeal, when we review the denial of a motion to suppress a statement, we owe no deference to the way in which the trial court resolved questions of law, but we generally accept its findings about questions of fact and credibility unless clearly erroneous.[6] *Pulley v. State*, 291 Ga. 330, 341 (2) (729 SE2d 338) (2012). Applying these familiar and settled principles in this case, we conclude that the trial court did not err when it denied the motion to suppress the statements that Edenfield gave to investigators.

The assurance that, if only Edenfield told the truth, he could go home and care for his elderly mother, was offered in a March 13 interview, before Edenfield was arrested. When its context is considered, it becomes clear that Edenfield could not reasonably have understood this assurance as a promise that he would not be charged with crimes against Christopher even if he admitted his own participation in such crimes. See, e.g., *Brown*, 290 Ga. at 870 (2) (c) ("Appellant could not have reasonably understood the investigators' statements to mean that he would *never* be charged or arrested for his crimes." (citation and punctuation omitted)); *Duke v. State*, 268 Ga. 425, 426 (2) (489 SE2d 811) (1997) ("Duke certainly could not reasonably have believed that, if he implicated himself in his statement, officers who were charged with enforcing the law would ignore his criminal conduct and would not charge him with any crime whatsoever."). At the time, the investigators indicated to Edenfield that they then had no present intention of charging Edenfield with anything unless he obstructed their investigation by lying, inasmuch as they believed George was responsible for killing Christopher, and they also believed it likely that Edenfield knew of what George had done. Cf. *Foster v. State*, 283 Ga. 484, 487 (2) (660 SE2d 521) (2008) (statement by investigators that suspect "could be a witness or a defendant" did not, in context, amount to an implied promise of lighter punishment, but was only an exhortation to tell the truth).

---

[6] But when the material facts are not in dispute — when they can be ascertained definitively, for instance, from a video recording of a statement — we give less deference to the fact findings of the trial court. *Sosniak v. State*, 287 Ga. 279, 280 (1) (695 SE2d 604) (2010).

Viewed in this context, the assurance amounted only to an "admonish[ment] to tell the truth, or else face arrest for felony hindering of the investigation [into what George had done]," and no "hope of benefit" springs from such an admonishment. *Mangrum v. State*, 285 Ga. 676, 678 (2) (681 SE2d 130) (2009). See also *Duke*, 268 Ga. at 426 (2) ("By informing Duke that he could be a witness against Barger or, if he withheld evidence, risk becoming a defendant himself, the officers clearly did not imply that Duke would not be charged if he was himself involved in the murder."); *Parker v. State*, 256 Ga. 543, 547 (1) (d) (350 SE2d 570) (1986) ("Parker was to receive the promised benefit only if he successfully denied the crime, not if he admitted it.").

About the suggestion that Edenfield might help George get mental health treatment by giving a truthful account of what George had done, that suggestion did not relate in any way to any charges against Edenfield himself, and it, therefore, is not one from which a "hope of benefit" might have arisen. See *White*, 266 Ga. at 135 (3). And as to the prospect of the investigators helping Edenfield with his landlord, that was a subject raised by Edenfield himself. Moreover, the context of the latter assurance makes clear that the response of the investigators did not relate to any criminal charges against Edenfield. See id. The trial court did not err when it denied the motion to suppress the statements.[7]

3. Citing OCGA § 17-7-150 (b), Edenfield argues that the trial court erred when it held the trial in Glynn County, notwithstanding, he says, a high risk of violence against him.[8] Edenfield presented some evidence of angry comments directed toward him in local media coverage,[9] as well as some evidence of verbal harassment by fellow inmates at the local jail, where Edenfield was held under special

---

[7] Edenfield also contends that the voluntariness of his statements — and his understanding of assurances given to him by investigators — must be considered in the light of his low intellectual capacity. But our review of the recordings of his statements reveals that he had adequate capacity to understand the context of the assurances and that he did, in fact, understand that context. Moreover, this conclusion is confirmed by expert testimony at trial, which showed that Edenfield has an intelligence quotient of 83, which puts him in the low end of the average range. See *Schneckloth v. Bustamonte*, 412 U. S. 218, 226 (II) (A) (93 SCt 2041, 36 LE2d 854) (1973) (noting that intelligence of the defendant is among the totality of circumstances to be considered in weighing the voluntariness of his statement).

[8] In pertinent part, OCGA § 17-7-150 (b) provides: "If the evidence submitted shall reasonably show that there is probability or danger of violence, it shall be mandatory on the judge to change the venue to such other county as, in his judgment, will reasonably avoid violence."

[9] In his brief, Edenfield suggests that one of the exhibits that he submitted in support of his argument about local media coverage is missing from the record. We have determined, however, that the exhibit is not missing, but instead was placed in the record out of order.

security conditions. The trial court found, however, that adequate security could be afforded Edenfield, but it nevertheless indicated that it would monitor the security conditions during the course of the trial and revisit the issue if necessary. We are satisfied that the trial court fulfilled its obligations under OCGA § 17-7-150 (b), and we see no abuse of discretion in the holding of the trial in Glynn County. See *Gunn v. State*, 245 Ga. 359, 361 (2) (264 SE2d 862) (1980) (noting discretion of trial court with respect to such matters).

4. Edenfield also argues that the trial court erred when it denied his request for leave to file an application for interim review in this Court. The denial of such a request cannot be appealed. See OCGA § 17-10-35.2 ("An order obviating interim appellate review shall not be appealable."). And in any event, Edenfield can show no harm from the denial of leave to seek interim review because he is free in this appeal to raise any issues that he might properly have raised in an application for interim review. OCGA § 17-10-35.1 (h).

*Jury Issues*

5. We next consider whether the trial court erred when it rejected a challenge to the composition of the list from which the prospective jurors were drawn. In support of this challenge, Edenfield argued that Hispanic persons were underrepresented on the list. Edenfield failed, however, to demonstrate any actual underrepresentation of persons eligible to serve. For that reason, his challenge properly was rejected. See *Ramirez v. State*, 276 Ga. 158, 162 (2) (575 SE2d 462) (2003) (holding that, within each of the various legal grounds for challenging the composition of a jury pool, a defendant bears the burden of showing actual underrepresentation). See also *Ellington v. State*, 292 Ga. 109, 117-118 (4) (735 SE2d 736) (2012) (holding that "forced balancing" of jury pools to match the most recent decennial Census is not unconstitutional, but also noting that practice of "forced balancing" has been superseded by statute, effective as of July 1, 2012); *Smith v. State*, 275 Ga. 715, 721-723 (4) (571 SE2d 740) (2002) (holding that a trial court should consider the number of persons of a given group who are legally eligible to serve as jurors).

6. We turn now to the contention that the trial court erred when it selected the jury from Jeff Davis County. Edenfield moved before trial to select a jury from somewhere other than Glynn County, and the trial court granted that motion, noting the heinous nature of the crimes, the public search for the victim, the extensive local media coverage of the crimes, and the prejudicial nature of that coverage. The trial court, however, chose Jeff Davis County as the venue from which a jury would be selected, a choice to which Edenfield objected,

both before trial and during jury selection. We see no error in the overruling of these objections.

We have held that a trial court must "order a change of venue for death penalty trials in those cases in which a defendant can make a substantive showing of the likelihood of prejudice by reason of extensive publicity." *Jones v. State*, 261 Ga. 665, 666 (2) (b) (409 SE2d 642) (1991). In applying this general standard, we have explained that, "[t]o justify a change of venue . . . a defendant must show either that the trial setting was inherently prejudicial as a result of pretrial publicity, or actual bias on the part of the individual jurors." *Jones v. State*, 267 Ga. 592, 594 (1) (a) (481 SE2d 821) (1997). In some cases, the trial court may be able to discern circumstances to properly justify a change of venue before the trial begins. See *Barnes v. State*, 269 Ga. 345, 347 (2) (496 SE2d 674) (1998) (noting that appropriate considerations include "the size of the community, the extent of media coverage, and the nature of the media coverage, especially if the coverage was inaccurate or inflammatory"). In many other cases, however, the trial court might reasonably decide to await voir dire before making a final decision about venue. This is true because, "[a]lthough the extent and timing of the pre-trial publicity are factors in determining whether there has been such a showing [of a likelihood of prejudice], the decisive factor is the effect of the publicity on the ability of prospective jurors to be objective." *Freeman v. State*, 268 Ga. 185, 186 (2) (486 SE2d 348) (1997). In the light of evidence showing that the local media coverage available in Glynn County was not widely available in Jeff Davis County, the trial court, we conclude, reasonably decided to defer ruling on the objections to selecting a jury from Jeff Davis County until voir dire.[10]

In the course of voir dire, 156 prospective jurors from Jeff Davis County were examined, both in panels and individually. The examination of the panels included inquiry into whether the prospective jurors had been exposed before trial to any information about the case. Of the 156 prospective jurors, only 18 were excused for reasons clearly related to views that they had developed from pretrial information about the case, whether as a result of media coverage or word

---

[10] Just before voir dire began, Edenfield moved the trial court to reconsider its decision to undertake a voir dire of Jeff Davis County jurors. That motion was based on a reporter apparently having interviewed several residents of Jeff Davis County for a story that ran in a Glynn County newspaper. The trial court denied the motion to reconsider, and we find no error in that denial, especially because any prejudice arising from those interviews was likely to be limited to a very small number of persons, all of whom could be identified during voir dire.

of mouth.[11] See, e.g., *Perkinson v. State*, 279 Ga. 232, 235 (5) (610 SE2d 533) (2005) (finding venue proper, even assuming that 15 of 100 prospective jurors were excused based on opinions formed as a result of pretrial publicity); *Gissendaner v. State*, 272 Ga. 704, 707 (2) (532 SE2d 677) (2000) (finding venue proper where 14 of 111 prospective jurors were excused based on opinions formed as a result of pretrial publicity); *Barnes*, 269 Ga. at 348 (2) (finding venue proper where two-thirds of prospective jurors had heard about case, but only 5 of 74 were excused based on opinions formed as a result of pretrial publicity); *Freeman*, 268 Ga. at 186 (2) (finding venue proper where 9 of 96 prospective jurors were excused based on opinions formed as a result of pretrial publicity). Slightly more than a third of the prospective jurors in this case indicated that they had heard something about it before trial, but most of what they had heard was limited in scope, was not inaccurate, did not concern matters that would be inadmissible at trial, and revealed little that would not be made known at trial, even as early as voir dire.[12] See *Gissendaner*, 272 Ga. at 706 (2). See also *King v. State*, 273 Ga. 258, 261 (4) (539 SE2d 783) (2000). These prospective jurors were not found qualified to serve without first being subjected to extensive individual examination to confirm that they did not have any fixed views of the case, that they could be fair and impartial, and that they would be able to set aside anything that they had heard before trial and consider only the evidence presented at trial. See *Heidler v. State*, 273 Ga. 54, 58 (4) (537 SE2d 44) (2000) (citing *Irvin v. Dowd*, 366 U. S. 717, 723 (81 SCt 1639, 6 LE2d 751) (1961)). In light of the limited number of prospective jurors excused based on their exposure to pretrial publicity, and our favorable assessment of the standard applied by the trial court during voir dire, we conclude that the trial court did not abuse its discretion in overruling the objections after voir dire to selecting a jury from Jeff Davis County. See *Ledford v. State*, 289 Ga. 70, 74 (2) (709 SE2d 239) (2011) (affirming denial of motion to change venue in light of rigorous standard applied by trial court where only 22 of 120 prospective jurors were excused based on their exposure to pretrial publicity). See

---

[11] Edenfield says that 20 prospective jurors were excused for having fixed views that formed as a result of pretrial influences. But our own review of the record reveals that two of these prospective jurors were excused for having strong views about crimes against children and that they likely were informed in the course of the voir dire that this case involved allegations of such crimes.

[12] Not every prospective juror who initially indicated some degree of exposure to pretrial publicity was later questioned individually about the extent and nature of that exposure, inasmuch as some were disqualified for other reasons. But the individual voir dire of the other jurors who had initially indicated such exposure suggests that a large number of these prospective jurors ultimately would have proven qualified to serve.

also *Gissendaner*, 272 Ga. at 706 (2) (noting discretion of trial court on motion to change venue).

7. Edenfield also claims that the trial court erred when it refused to strike a prospective juror who said in voir dire that he "couldn't consider the possibility of parole" for someone convicted of the murder if the murder involved the "sexual abuse [of] a child." If that were all the prospective juror had said, perhaps Edenfield might be right. After all, we have held in prior cases that a defendant is entitled to a full panel of qualified jurors against which to exercise his peremptory strikes, *Rice v. State*, 292 Ga. 191, 194-195 (3) (733 SE2d 755) (2012), and we have held that a juror unable or unwilling to give fair consideration to all of the legal sentencing options is not qualified.[13] *Brockman v. State*, 292 Ga. 707, 718 (7) (a) (739 SE2d 332) (2013). See also *Ellington*, 292 Ga. at 136 (7) (e) ("The problem is with prospective jurors who, if asked about a critical fact involved in a case, admit that they would automatically return a certain verdict, regardless of other facts and regardless of the law. Such prospective jurors are not impartial . . . ."); *Raheem v. State*, 275 Ga. 87, 90 (5) (a) (560 SE2d 680) (2002) ("A prospective juror who would not be able or willing to consider the sentence of life with the possibility of parole upon a conviction for murder is biased in a manner that would make him or her unqualified to serve."), disapproved on other grounds by *Patel v. State*, 282 Ga. 412, 413 (2), n. 2 (651 SE2d 55) (2007).

The prospective juror in this case, however, said a great deal more in his voir dire, and based on *all* that he said, the trial judge found that he was qualified. That finding deserves the respect of appellate judges sitting at a time, and in a place, far removed from trial. Appellate judges, after all, have only a cold record from which to size up a prospective juror, and they are in no position to assess whether a prospective juror spoke with assurance or uncertainty, enthusiasm or hesitation, candor or guile. On the other hand,

> [a] trial judge is uniquely positioned to evaluate whether a prospective juror can render an impartial verdict, consider-ing that the trial judge . . . can observe a prospective juror in

---

[13] That said, a juror predisposition against parole may not have the same implications under current law. In 2009, the General Assembly amended the sentencing statutes and repealed some of the earlier requirements for the imposition of imprisonment for life without the possibility of parole, namely the requirements that an aggravating circumstance be proven beyond a reasonable doubt and that the jury recommend a sentence without parole. See Ga. L. 2009, p. 223, §§ 4-6. Edenfield was convicted of crimes that predate the amendment, however, and the amendment does not, therefore, apply in his case. See id., § 8.

person and take account of her demeanor and countenance, not just the words that she speaks.

*Harrison v. State*, 309 Ga. App. 454, 454 (1) (711 SE2d 35) (2011). See also *Ellington*, 292 Ga. at 127 (7) (b) (with respect to voir dire and qualification of prospective jurors, "appellate courts should give substantial deference to the decisions made by trial judges, who oversee voir dire on a regular basis, are more familiar with the details and nuances of their cases, and can observe the parties' and the prospective jurors' demeanor").

For these reasons, whether a prospective juror is qualified to serve is a question committed to the discretion of the trial court, a discretion that we previously have characterized as "broad." *Sears v. State*, 292 Ga. 64, 66 (2) (734 SE2d 345) (2012). We review the failure to strike a prospective juror for cause only for an abuse of that broad discretion, and we owe substantial deference to the findings of the trial court, including its "resolution of any equivocations or conflicts" in the testimony of the prospective juror. *Leonard v. State*, 292 Ga. 214, 217 (3) (735 SE2d 767) (2012). Moreover, and in keeping with the substantial deference that we owe to the trial court, we must look to the record as a whole when we review the way in which the trial court exercised its broad discretion. *Ledford*, 289 Ga. at 76 (6). See also *Raheem*, 275 Ga. at 91 (5) (b) ("Viewing each challenged juror's voir dire as a whole, this Court concludes that the trial court did not abuse its discretion in finding the jurors qualified to serve." (citation omitted)). Looking to the record in this case as a whole, we see no abuse of discretion in the failure of the trial court to strike for cause the prospective juror at issue.

Near the beginning of his voir dire, the trial court told this prospective juror that the trial would involve two phases and that, "should this trial proceed to a sentencing phase[,] jurors are prohibited from deciding . . . what sentence would be appropriate until after they've heard and considered all the evidence in that sentencing phase." The trial court then explained:

Now, if there's a guilty verdict as to the malice murder count[,] the only sentence the Jury could impose would be a sentence of life with the possibility of parole unless the Jury found one or more, unanimously found one or more aggravating circumstances has been presented by the evidence beyond a reasonable doubt. Now, the finding by the Jury that an aggravating circumstance was present does not mean that the death penalty or a sentence of life without parole is the appropriate sentence. It simply means that[,] at that

point in time[,] the Jury has three sentencing options: the death penalty, life without parole[,] and life which carries the possibility of parole. To serve as a Juror, you must honestly believe that[,] if the trial proceeds to that point, the sentencing phase, that you could fairly consider and if appropriate impose any one of those three sentencing options and that you would not rule out or be strongly inclined one way or the other.

At that point, the trial court inquired whether the prospective juror could consider "both life imprisonment [and] the death penalty without being predisposed either way," and the juror said that he could.

The trial court next inquired whether the prospective juror could consider both life imprisonment without the possibility of parole and life imprisonment with the possibility of parole, and the following exchange occurred:

THE COURT: As I mentioned to you[,] there are two life imprisonment sentencing options. There's life without parole and a life sentence which carries the possibility of parole. Could you consider either of those sentences depending upon the circumstances?

[PROSPECTIVE JUROR]: I, I could consider them[,] but if, if, if it turns out that the person had been convicted of a case where he had, was guilty of sexual abuse [of] a child[,] then I certainly wouldn't, wouldn't ever allow, I couldn't consider the possibility of parole because it could happen again. I, and I —[14]

THE COURT: It would be fact driven. It would be depending upon the facts —

[PROSPECTIVE JUROR]: Oh, absolutely.

THE COURT: — and the circumstances of the case?

[PROSPECTIVE JUROR]: Absolutely.

THE COURT: Okay. And depending upon the facts and circumstances of the case[,] you could, you could consider either one of those life imprisonment[ ] sentencing options?

---

[14] The dissenting opinion says that the initial response of the prospective juror — that he could not consider life with the possibility of parole for a person who was guilty of murder and the sexual abuse of a child — staked out a "firm position." We have nothing before us but a cold transcript, however, and although the potential juror spoke the word "certainly," he also appears to have stammered as he spoke, which suggests, if anything, uncertainty and hesitation. Such characteristics are not the marks of a "firm position."

[PROSPECTIVE JUROR]: Yes.

THE COURT: All right. Then I take it that, that you are genuinely open to considering, not knowing the facts and circumstances of the case, you are genuinely open to consider those three sentencing options, the death penalty, life without parole[,] and life which carries the possibility of parole?

[PROSPECTIVE JUROR]: Yes.

The trial court subsequently asked whether the prospective juror "could realistically consider and vote to impose a sentence of life which carries the possibility of parole if the circumstances warranted," and he responded, "Yes." Finally, the trial court inquired whether the prospective juror was "conscientiously opposed to a sentence of life with the possibility of parole for someone who has been convicted of murder," and he replied that he "could consider that [sentencing] option for murder, yes."

At that point, the trial judge and the lawyers discussed the prospective juror sidebar. In the course of that discussion, defense counsel pointed to the earlier testimony of the prospective juror that he could not consider the possibility of parole if "sexual abuse [of] a child" was involved, and the judge offered his understanding of that testimony: "I took that to mean that[,] if he was, that probably could be an issue if he was convicted of some type [of] heinous crime against a child and, and of the murder conviction. I don't know what the evidence . . . is going to be." The sidebar discussion concluded, and the trial court permitted each of the lawyers to examine the prospective juror.

The prosecuting attorney explained that the jury would have to find a statutory aggravating circumstance "before you can even consider life without parole or the death penalty," and he asked the prospective juror whether a juror ought to "listen to all the evidence presented there before you make up your mind about what punishment is appropriate." The prospective juror agreed that a juror should do so. The following exchange then occurred:

[PROSECUTING ATTORNEY]: Now, you will be able to consider all of the evidence that you heard in the first part of the trial. The State may present additional evidence. We call it aggravating circumstances, evidence to, to try to convince you that the death penalty or life without parole is the appropriate sentence. The Defense at that point in time gets to present . . . what's called mitigating evidence[,] to convince you that a sentence less than death or less than life without

parole would be appropriate. That's the way our process works. I don't know if you knew that[,] but that's the way it works. You understand that that's how that happens?

[PROSPECTIVE JUROR]: I do.

[PROSECUTING ATTORNEY]: And when I asked you a minute ago do you believe a Juror should wait to make a decision about what their verdict should be until after you've heard that evidence that I'm talking about both from the State and the Defense?

[PROSPECTIVE JUROR]: Yes.

[PROSECUTING ATTORNEY]: Okay. And, again, I go back to, you understand that and agree that that's why there's a range [of sentencing options] because you don't know what you're going to hear at this point?

[PROSPECTIVE JUROR]: I do.

[PROSECUTING ATTORNEY]: Okay. At this point[,] I cannot suggest to you what the evidence will be either in mitigation or in aggravation or for the trial of the case[,] and we are asking you [for] your best judgment about these questions. And we understand that it's pretty hard. And we're talking about general feelings in a particular case. What I heard you say to the Judge was that you could consider based on the facts and circumstances that you find[,] that you could consider, that means think about, seriously about all three of those sentencing options as a possible verdict in your case.

[PROSPECTIVE JUROR]: Yes.

[PROSECUTING ATTORNEY]: Did I hear you say that?

[PROSPECTIVE JUROR]: Yes.

[PROSECUTING ATTORNEY]: Okay. And would you do that, wait until you heard the evidence and consider all three of them before you returned a verdict in this case?

[PROSPECTIVE JUROR]: Yes.

[PROSECUTING ATTORNEY]: All right. You understand that whatever you decide at that point is up to you[,] but you have to wait and hear and listen and consider and think about all that evidence; you understand?

[PROSPECTIVE JUROR]: I do.

Later, the prosecuting attorney asked the prospective juror whether, "if you listen to all the evidence . . . the good and the bad[,] and you found from all of that that the appropriate [sentence] was life with the possibility of parole," he could vote to fix the punishment as life imprisonment with the possibility of parole. The prospective juror

said that, "[y]es," he could do so. The prosecuting attorney concluded by inquiring whether the prospective juror would base his consideration of the appropriate sentence on "the facts that you find in both parts of this case, the [guilt] part and then the sentencing phase," and the prospective juror said that he would.

Defense counsel then had an opportunity to voir dire the prospective juror, but he asked only one question about the extent to which the prospective juror would consider all of the sentencing options:

> [DEFENSE ATTORNEY]: Sir, you've already been asked this question a hundred different ways. I've got a slightly different way to ask it. . . . As you, as you've already heard a number of times[,] there will be evidence given[,] and before you can determine guilt or innocence, obviously, but if you found someone guilty of intentional murder[,] perhaps even some of the other charges that were read to you[,] and you went through the second, second phase[,] and you listened to the State's evidence and any evidence that we might put up, what we call mitigation, and you felt that the death penalty was not the appropriate sentence for whatever reason for this intentional act which you've already found, intentional act of murder that you already found, in your heart of hearts could you give fair consideration in that situation to life with the possibility of parole?
> [PROSPECTIVE JUROR]: Depending on the facts, yes.

After the voir dire concluded, defense counsel moved the trial court to strike the prospective juror for cause "[o]n the ground of the answer that he gave that he would not entertain life with parole in the case of a conviction on molestation." The trial court denied the motion, finding "[o]n the totality of his responses during voir dire . . . he is fairly qualified."[15]

(a) Under Georgia law, a prospective juror enters voir dire with a presumption of impartiality, and if he is to be struck for cause, the party seeking to have him struck for cause bears the burden of proving that he is unqualified to serve. *Hollis v. State*, 269 Ga. App.

---

[15] Although the trial court found that this prospective juror was qualified, we note that it excused 25 prospective jurors whom it found unqualified because they could not fairly consider the sentencing option of life with the possibility of parole, 18 prospective jurors whom it found to be unqualified because they could not fairly consider either of the sentencing options other than the death penalty, and five prospective jurors whom it found to be unqualified because they could not fairly consider the death penalty as a sentencing option.

159, 159 (1) (603 SE2d 516) (2004). See also *Kim v. Walls*, 275 Ga. 177, 179 (563 SE2d 847) (2002) (noting "the fundamental principle that 'the law presumes that potential jurors are impartial,' and that the burden of proving partiality still rests with the party seeking to have the juror disqualified" (citations omitted)). Here, when the prospective juror said that he could not consider the possibility of parole if the defendant were convicted not only of murder, but also of sexually abusing a child, it was some evidence, no doubt, that the prospective juror might not be perfectly impartial as to each of the legal sentencing options. But as recounted above, there was other, substantial testimony during voir dire that pointed another way, namely testimony that the prospective juror agreed to hear all of the evidence — in both phases of the trial, both aggravating and mitigating, "the good and the bad" — before closing his mind to any sentencing option, as well as his acknowledgment of the law that life with the possibility of parole would be the *only* sentencing option if the State failed to prove a statutory aggravating circumstance beyond a reasonable doubt, sexual abuse or not. In addition, when he was asked by defense counsel whether he could consider each of the sentencing options if the defendant stood convicted of murder and "perhaps even some of the other charges that were read to you" — which charges included, among other things, aggravated child molestation and child molestation[16] — the prospective juror said that he could do so.

As we have explained before, a prospective juror is not unqualified simply because he is inclined to give substantial weight to a specific fact or circumstance — such as the sexual abuse of a child — in his consideration of an appropriate sentence. See *Ellington*, 292 Ga. at 136 (7) (e) ("[T]he issue is not whether the prospective juror will consider a critical fact to be very important or worthy of great weight."). Nor is there a problem with a juror who, after listening to all of the evidence and the charge of the court, concludes that a single fact, and only that fact, matters — for instance, that a child was sexually abused — and thereafter assigns no weight at all to the other facts and circumstances of the case. See id. ("There is nothing wrong, for example, with jurors who consider carefully, and even assign dispositive weight to, [a particular fact] — so long as that judgment is rendered fairly, at the end of the case, after the juror has heard not only that fact (assuming it is proved) but all the other evidence and after the juror has considered that evidence in light of the court's legal instructions."). Rather, the problem lies with a prospective juror who

---

[16] The trial court earlier had read the list of charges from the indictment to the prospective jurors.

already has made up his mind about the appropriate sentence — either conditionally upon proof of some critical fact or absolutely — before the evidence is in, and who simply will not listen to the full range of evidence or heed the charge of the court. See id. So, when a prospective juror has indicated at first a leaning toward or against a particular sentencing option, he nevertheless "may be rehabilitated by additional questions that reveal that [he] will not make up [his] mind[ ] until [he] hear[s] all the evidence and the law," id. (citation omitted), and that is the case even when the initial indication from the prospective juror seems absolute and unequivocal. See, e.g., *Ledford*, 289 Ga. at 79 (7) (h) (no abuse of discretion in qualification of prospective juror who "initially indicated that she would not consider a sentence of life with the possibility of parole," but after the trial process and law were explained, later said that "she would consider all of the evidence and all three possible sentences"); *Lance v. State*, 275 Ga. 11, 16 (7) (b) (560 SE2d 663) (2002) (no abuse of discretion in qualification of prospective juror who said unequivocally that, "if you're found guilty of murder[,] you should get the death penalty," but who later said that he would "listen to 'additional evidence' after a murder conviction and follow the law as given by the trial court"); *Bishop v. State*, 268 Ga. 286, 290 (6) (486 SE2d 887) (1997) (no abuse of discretion in qualification of prospective juror who said at first that "he would always vote for the death penalty," but who later said that "he could listen with an open mind to all of the evidence" and that "he could vote for any of the three sentencing options, even where there was an aggravating circumstance").

The dissenting opinion accepts that the prospective juror in this case was not beyond rehabilitation, but it concludes that he was not actually rehabilitated, apparently because the rehabilitation questions that were put to him, and the answers that he gave to those questions, did not explicitly reference his earlier statement that he could not consider parole if a child was murdered and sexually abused. That approach, however, ignores important context and deprives the trial court of the full benefit of the deference that, according to our precedents, we owe. It is true that, when the prospective juror here said — repeatedly — that he could listen to all of the evidence and could give genuine consideration to each of the three sentencing options, he did not add explicitly, "notwithstanding what I said earlier about sexual abuse." But he nevertheless said unequivocally that he could listen to all of the evidence and could give genuine consideration to each of the three sentencing options. See *Ellington*, 292 Ga. at 136 (7) (juror who has indicated a leaning toward or against a sentencing option based on a critical fact "may be

rehabilitated by additional questions that reveal that [he] will not make up [his] mind[ ] until [he] hear[s] all the evidence and the law" (citation omitted)).

(b) Even if it were necessary for the rehabilitation testimony to relate back more specifically to the earlier statement that the prospective juror could not consider parole if sexual abuse of a child were involved, we are satisfied that the trial court in this case might reasonably have concluded that it did. In light of the timing and sequence of the various questions put to the prospective juror in the course of his voir dire,[17] the trial court might reasonably have thought that the prospective juror meant by his subsequent testimony to qualify his earlier statement about parole. The trial court also might reasonably have thought that the prospective juror understood that the rehabilitation questions necessarily, but implicitly, related back to his earlier statement about sexual abuse, which is, of course, exactly what the trial judge, the prosecuting attorney, and defense counsel intended by those questions. The timing and sequence of the several explanations of the sentencing process during voir dire might have reinforced such thoughts. Perhaps the demeanor of the lawyers and the prospective juror, their body language, the cadence of their speech, and the tones of their voices — all of which were observed by the trial judge, but remain unknown to us — would have reinforced such thoughts as well. The record does not demand, of course, that the trial court have understood the prospective juror in this way, but it permits the trial court to have done so. And that is sufficient to render the record as a whole ambiguous with respect to the qualification of this prospective juror.[18]

Given this ambiguity, if the trial court had seen fit to excuse the prospective juror for cause, that would have been a reasonable

---

[17] We have acknowledged before that the timing and sequence of voir dire matter, and we have implied that they properly can be considered in understanding exactly what a prospective juror meant by his testimony in voir dire. See, e.g., *Nance v. State*, 272 Ga. 217, 223 (6) (526 SE2d 560) (2000) (noting that "[t]wo of these statements [that the prospective juror would always impose death] came after [the juror] was informed of the procedure in a capital trial and that not all murderers receive the death penalty under Georgia law").

[18] Moreover, we have cautioned before that, at the outset of voir dire, "[m]any prospective jurors [will] have given little thought to capital punishment and [will be] unfamiliar with the procedures of a death penalty trial and the jury's role in the sentencing determination." *Brannan v. State*, 275 Ga. 70, 77 (6) (561 SE2d 414) (2002). As such, we sometimes find prospective jurors "struggling to formulate and articulate their views for the first time," and sometimes giving confusing, ambiguous, or contradictory answers about the sentencing options. Id. For these very reasons, we do not insist that a trial judge accept every word spoken by a prospective juror about the sentencing options as if it were spoken literally, with absolute precision, and with perfect accuracy, even when a more full consideration of all the circumstances indicates otherwise.

exercise of its discretion. But that does not mean that it was unreasonable for the trial court to do otherwise. The very notion of discretion implies that reasonable people sometimes will reasonably disagree about what is to be done, and in such a case, that call belongs to the one to whose discretion the question is committed by law. This is such a case, and the discretion here belongs to the trial court. See, e.g., *Leonard*, 292 Ga. at 217 (3); *Ledford*, 289 Ga. at 76 (6); *Raheem*, 275 Ga. at 91 (6) (b). For these reasons, the trial court did not err when it found the prospective juror at issue to be qualified.

8. We turn now to the claim that the State used its peremptory strikes unconstitutionally to strike five prospective jurors on the basis of their race. See generally *Batson v. Kentucky*, 476 U. S. 79 (106 SCt 1712, 90 LE2d 69) (1986). When the trial court considered the objections to the peremptory strikes of the State, it properly applied the familiar and settled three-stage analysis that courts regularly employ with respect to such objections:

> (1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven discriminatory intent.

*Thomas v. State*, 274 Ga. 156, 161 (5) (549 SE2d 359) (2001). The trial court concluded that Edenfield had made out a prima facie case of discrimination, insofar as he showed that the prosecuting attorneys used five of their eight peremptory strikes to exclude black jurors. The trial court then directed the prosecuting attorneys to explain the reasons for these strikes, which the prosecuting attorneys did. The trial court accepted that the reasons for the strikes were race-neutral, and moving to the third and final stage of the three-stage analysis, the trial court concluded that Edenfield had failed to prove discriminatory intent.

On appeal, Edenfield contends that the trial court erred at the third stage, insofar as the explanations for the strikes offered by the prosecuting attorneys are contradicted by the record, Edenfield says, and in any event, are unpersuasive. As we assess this contention, we consider whether the record shows that the reasons given for the strikes amount to mere pretext. See *Toomer v. State*, 292 Ga. 49, 55 (2) (b) (734 SE2d 333) (2012). We must, however, afford "great deference" to the findings of the trial court on the ultimate question of discriminatory intent, and we will disturb such findings only if they are "clearly erroneous." Id. at 57-58 (2) (d).

(a) Regarding the first prospective juror at issue, the prosecuting attorneys explained that this juror had a relative in prison and previously had negative experiences with law enforcement. Edenfield argues that these explanations should be discounted because it is not clear whether the relative in prison was the brother of the juror, as the trial court found, or some other relation, but we conclude that any lack of clarity on this point is inconsequential. Edenfield also argues that these explanations should be discounted because the juror previously had served as a corrections officer for minimum-security federal prisoners, but we cannot conclude that this fact renders the explanations of the prosecuting attorneys mere pretext. In addition, Edenfield asserts that the motives of the prosecuting attorneys were cast in doubt by their failure to strike a white juror whose brother had been tried for murder. That white juror, however, indicated that his brother had been prosecuted by another prosecutor, that the prosecution had been in the 1970s, and that it would not affect her consideration of this case in any way. Finally, Edenfield argues that the secondary reasons offered by the prosecuting attorneys for this strike — reasons that concerned the strength of the juror's views on the death penalty and her willingness to consider a sentence of life with the possibility of parole — were not compelling ones. We conclude, however, that the latter argument is unavailing in light of the clear indication by the prosecuting attorneys that their primary reasons for striking this juror were her relative in prison and her prior bad experiences with law enforcement officers. On balance, we find no clear error in the finding of the trial court that the prosecuting attorneys had no discriminatory intent with respect to striking this juror. See id.

(b) Regarding the second prospective juror at issue, the prosecuting attorneys explained that the juror initially expressed opposition to the death penalty, expressed a preference for life without parole, was unable to answer some of the questions on voir dire, appeared extremely nervous, talked to herself, and seemed unable to understand questions asked of her. Edenfield urges us to discount any explanation related to a stated preference for life without parole as a sentencing option, arguing that the juror said that she preferred that option only as against life with the possibility of parole. Our review of the record, however, confirms the assertion of the prosecuting attorneys that the juror indicated a preference for life without parole in the context of considering all three sentencing options, including the death penalty. Equally important, the record supports the finding of the trial court that this juror was confused and "waffling" throughout her voir dire. Accordingly, we see no clear error in the finding that the strike of this juror involved no discriminatory intent. See id.

(c) Regarding the third prospective juror at issue, the prosecuting attorneys explained that the residential address given by the juror was a home owned by a relative and was verified by the Sheriff and the Chief of Police to be a crack house, that one of her family members was serving a life sentence, that one of the prosecuting attorneys had prosecuted persons related to the juror through her estranged husband, that she was visibly upset during her voir dire, and that the prosecuting attorney hoped to reach more favorable jurors farther down the jury list by striking her. As with another juror discussed above, we note that this juror was not similarly situated with a white juror whose brother had been tried for murder, but who indicated that her brother was prosecuted by another prosecuting attorney, that the prosecution had occurred in the 1970s, and that it would not affect her consideration of Edenfield's case in any way. We further note that the juror at issue here suffered from a number of difficulties that might reasonably have been deemed objectionable by the prosecuting attorneys. Accordingly, we conclude that the trial court did not clearly err when it found that the prosecuting attorneys had no discriminatory intent when they struck this juror. See id.

(d) Regarding the fourth prospective juror at issue, the prosecuting attorneys explained that the juror had failed to appear voluntarily for jury service and had to be retrieved from his workplace by the Sheriff, that the juror's "whole family ... ha[d] mental issues," and that the juror was only 19 and single. Edenfield argues that the reasons related to age and marital status were mere pretext, noting that the prosecuting attorneys accepted a white juror who was single and childless. The prosecuting attorneys explained, however, that they chose not to strike that other juror because they believed that the defense would strike her inasmuch as she purportedly was a victim of incest, and Edenfield previously had been convicted of incest against his daughter. We also note the finding of the trial court that the failure of this juror to appear voluntarily was dispositive of the question of race discrimination. On balance, we conclude that the trial court did not clearly err when it found no racial discrimination in the strike of this juror. See id.

(e) As to the fifth and final prospective juror at issue, the prosecuting attorneys explained that the sister of the juror had already been selected to serve and that they did not wish to have sisters serving together on the jury. The prosecuting attorneys also explained that the juror felt uncomfortable with the death penalty and that her husband, like Edenfield, had retired from the National Guard. We see no clear error in the finding that the prosecuting attorneys did not act with discriminatory intent when they struck this juror. See id.

*Guilt-Phase Issues*

9. Edenfield argues the trial court erred when it admitted certain statements that he gave to law enforcement officers because those statements were given after he was arrested, after counsel had been appointed, and in custodial interviews initiated by law enforcement and outside the presence of counsel. Even assuming the factual predicates of this argument, it must fail because Edenfield does not show that he ever asserted his right to counsel during any custodial interview, and because the record instead clearly shows that he waived his right to have counsel present at the custodial interviews, after being advised of his rights. See *Montejo v. Louisiana*, 556 U. S. 778 (129 SCt 2079, 173 LE2d 955) (2009) (overruling *Michigan v. Jackson*, 475 U. S. 625 (106 SCt 1404, 89 LE2d 631) (1986)). Furthermore, it does not appear that Edenfield preserved this issue for appellate review, insofar as our review of the record reveals that it was raised for the first time in his motion for a new trial. See *Martin v. State*, 281 Ga. 778, 779-780 (2) (642 SE2d 837) (2007).

10. We next consider the contention that the trial court erred when it admitted the "lightsaber" that had been recovered from the yard of the Edenfield home pursuant to consent to search. Edenfield argues that his consent was rendered invalid by the large number of officers present at the mobile home park at the time. This issue, however, was not preserved for appellate review because it was not raised in the trial court. See *Bryant v. State*, 288 Ga. 876, 894 (13) (b) (708 SE2d 362) (2011) ("Because Bryant did not raise this argument in his motion to suppress, he has waived it here"). In fact, Edenfield specifically stated at trial that he did not object to the admission of the "lightsaber."

*Sentencing-Phase Issues*

11. In closing argument at the conclusion of the sentencing phase, a prosecuting attorney argued that the jurors should select a sentence that would allow them to say, "I defended Christopher Barrios when he couldn't defend himself from that animal right there, raping and murdering him," referring to Edenfield. When Edenfield moved for a mistrial, the prosecuting attorney withdrew his remark and apologized to the jury for having made it. The trial court then informed the jury that the remark was "inappropriate" and directed the jury to "disregard it entirely." Edenfield renewed his motion for a mistrial, and the trial court again denied it. We have held that characterizing a defendant in closing arguments as an "animal" is "unnecessary and undesirable," but we also have held that allowing

such a remark is not always reversible error. See *Ellington*, 292 Ga. at 144 (10) (d) (citation and punctuation omitted). In this case, we conclude that the trial court, having already employed appropriate curative measures to address the improper reference to Edenfield as an "animal," did not abuse its discretion when it concluded that a mistrial was not required. See *Pace v. State*, 271 Ga. 829, 841 (27) (524 SE2d 490) (1999).

*Sentence Review*

12. Upon our review of the entire record, including the improper remark discussed above in Division 11, we conclude that the sentence of death in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See *Pace* at 841 (27) ("We also evaluate the possible prejudicial effect of these remarks . . . as part of our review to ensure that the death sentences were not improperly rendered due to the influence of passion, prejudice, and other arbitrary factors."). See also OCGA § 17-10-35 (c) (1).

13. The jury found beyond a reasonable doubt that the murder in this case was committed during the commission of an aggravated battery in that the anus of the victim was seriously disfigured, and that the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture and depravity of mind. See OCGA § 17-10-30 (b) (2) and (7). Although it is a closer question whether the evidence was sufficient to sustain the finding of aggravated battery, there was more than enough evidence to sustain the finding beyond a reasonable doubt that the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture and depravity of mind. See OCGA § 17-10-35 (c) (2) (requiring a review of the statutory aggravating circumstances found by the jury); UAP IV (B) (2) (providing that, in all death penalty cases, this Court will determine whether the verdicts are supported by the evidence). See also *Ring v. Arizona*, 536 U. S. 584 (122 SCt 2428, 153 LE2d 556) (2002); *Jackson*, 443 U. S. at 319 (III) (B). Even if the finding of aggravated battery were set aside for an insufficiency of the evidence, the death sentence in this case still would be valid because it is supported by another statutory aggravating circumstance that the evidence fully supports. See *Heidler v. State*, 273 Ga. 54, 66 (22) (537 SE2d 44) (2000). See also *Zant v. Stephens*, 462 U. S. 862 (103 SCt 2733, 77 LE2d 235) (1983).

14. Considering both the murder in this case, and Edenfield as a defendant, we conclude that the death sentence imposed was not disproportionate punishment within the meaning of Georgia law. See OCGA § 17-10-35 (c) (3); *Gissendaner*, 272 Ga. at 716-717 (19) (a)

(holding that this Court's statutorily mandated proportionality review concerns whether a particular death sentence is excessive per se or is substantially out of line). The cases in the Appendix support this conclusion in that each demonstrates a jury's willingness to impose a death sentence in a case involving murder during the commission of a sexual assault, or where the murder involved aggravated battery, torture, or depravity of mind. We further note that some of the cases in the Appendix involved the murder of a child. See OCGA § 17-10-35 (e).

*Judgment affirmed. All the Justices concur, except Melton, J., who concurs in judgment only as to Division 7 (b), and Thompson, P. J., and Benham, J., who concur in part and dissent in part.*

APPENDIX.

*Ledford v. State*, 289 Ga. 70 (709 SE2d 239) (2011); *Loyd v. State*, 288 Ga. 481 (705 SE2d 616) (2011); *Stinski v. State*, 286 Ga. 839 (691 SE2d 854) (2010); *O'Kelley v. State*, 284 Ga. 758 (670 SE2d 388) (2008); *Rivera v. State*, 282 Ga. 355 (647 SE2d 70) (2007); *Lewis v. State*, 279 Ga. 756 (620 SE2d 778) (2005); *Riley v. State*, 278 Ga. 677 (604 SE2d 488) (2004); *Presnell v. State*, 274 Ga. 246 (551 SE2d 723) (2001); *Drane v. State*, 271 Ga. 849 (523 SE2d 301) (1999); *Pace v. State*, 271 Ga. 829 (524 SE2d 490) (1999); *Pruitt v. State*, 270 Ga. 745 (514 SE2d 639) (1999); *Pye v. State*, 269 Ga. 779 (505 SE2d 4) (1998); *Raulerson v. State*, 268 Ga. 623 (491 SE2d 791) (1997); *Wellons v. State*, 266 Ga. 77 (463 SE2d 868) (1995); *Crawford v. State*, 257 Ga. 681 (362 SE2d 201) (1987).

THOMPSON, Presiding Justice, concurring in part and dissenting in part.

As is addressed by the majority in Division 7 of its opinion, Edenfield argues that the trial court erred by qualifying a prospective juror who expressed an unwillingness to consider life with the possibility of parole as a sentencing option in a case involving child molestation. Although this issue was not raised in Edenfield's original brief filed in this Court, it is properly before this Court pursuant to *Henry v. State*, 278 Ga. 617, 620 (1) (604 SE2d 826) (2004).

The relevant portion of the juror's voir dire began as follows:

THE COURT: As I mentioned to you there are two life imprisonment sentencing options. There's life without parole and a life sentence which carries the possibility of parole. Could you consider either of those sentences depending on the circumstances?

[JUROR]: I, I could consider them but if, if, if it turns out that the person had been convicted of a case where he had, was guilty of sexual abuse towards a child then I certainly wouldn't, wouldn't ever allow, I couldn't consider the possibility of parole because it could happen again. I, and I —
THE COURT: It would be fact driven. It would be depending on the facts —
[JUROR]: Oh, absolutely.
THE COURT: Okay. And depending upon the facts and circumstances of the case you could, you could consider either one of those life imprisonments sentencing options?
[JUROR]: Yes.

In this exchange, the pivotal portion is where the juror stated that he "certainly" would not "ever" consider a sentence that allowed for the possibility of parole in a case involving child molestation. The State correctly notes that, in this quoted exchange and elsewhere during voir dire, the juror repeatedly confirmed that he would consider all three sentencing options in light of the "facts and circumstances" proven at trial. However, this is the only portion of the juror's voir dire in which he explained what sentencing options he might be willing to consider where the "facts and circumstances" included child molestation.

We have recently emphasized in *Ellington v. State*, 292 Ga. 109 (735 SE2d 736) (2012) that, to be qualified to serve, a juror must be willing to consider all three sentencing options, even upon proof of a specified "critical fact" that is likely to be involved in the case. See *Ellington*, 292 Ga. at 121-139 (7) (addressing voir dire in a case involving the "critical fact" that two of the murders involved were of two young children). Although our holding in *Ellington* specifically concerned only the proper scope of voir dire questions, our reasoning clearly indicated that a juror who would not consider all three sentencing options if confronted with such a "critical fact" would be unqualified to serve. For example, we stated:

> The problem is with prospective jurors who, if asked about a critical fact involved in a case, admit that they would automatically return a certain verdict, regardless of other facts and regardless of the law. *Such prospective jurors are not impartial*, and the parties are entitled to ask appropriate questions in voir dire to identify their bias.

(Emphasis supplied.) Id. at 136 (7) (e). See also *Tollette v. State*, 280 Ga. 100, 102 (3) (621 SE2d 742) (2005) (holding that a juror who is

substantially impaired in his or her ability to consider life with the possibility of parole as a sentencing option is not qualified to serve). Here, the presence of multiple acts of child molestation was clearly such a "critical fact." The only direct discussion of this "critical fact" with the juror in question in Edenfield's case appears in the response of the juror that is quoted above. At that point, the trial court interrupted the juror and asked merely whether the juror would consider all three sentencing options under the "facts and circumstances" of the case. However, the juror had already stated plainly that he would never consider a sentence that allowed for the possibility of parole if those "facts and circumstances" included child molestation. Furthermore, the question with which the trial court interrupted the juror suggested that the juror should answer questions about the sentencing options, both at that point and later in voir dire, not in light of the specific "critical fact" of child molestation but in a generic context. This view of how the trial court was guiding the process of voir dire and exercising its discretion on the matter is buttressed by noting that the trial court later said the following at a bench conference with the parties:

> Well, he said that if, if it involved that I took that to mean that if he was, that probably could be an issue if he was convicted of some type of heinous crime against a child and, and of the murder conviction. I don't know what, I don't know what the evidence is going to be.

The juror never once gave a response that retreated from his initial, firm position regarding the possibility of parole for cases involving child molestation, and the trial court was operating under the mistaken belief that such a position was not disqualifying because the particular "fact" of child molestation had not *yet* been proven through the evidence.

If the juror had been questioned more closely on the matter, including with questions providing him with an explanation of the role of mitigating circumstances, he might or might not have given a further response indicating more flexibility in cases involving child molestation than the juror first expressed. However, no subsequent questioning led the juror to make any further statements modifying or withdrawing his initial statement. The closest that any question came to seeking such clarification appears in the following exchange, which interestingly was led by defense counsel:

> [DEFENSE ATTORNEY]: [I]f you found someone guilty of intentional murder [and] perhaps even some of the other

charges that were read to you and you went through the second, second phase and you listened to the State's evidence and any evidence that we might put up, what we call mitigation, and you felt that the death penalty was not the appropriate sentence for whatever reason for this intentional act which you've already found, intentional act of murder that you already found, in your heart of hearts could you give fair consideration in that situation to life with the possibility of parole?

[JUROR]: Depending on the facts, yes.

Although this question added the matters of mitigating evidence and the possibility that Edenfield might be convicted of some of the non-murder charges, which included some charges of child molestation but also some charges unrelated to child molestation, it did not specifically address whether the juror would consider allowing the possibility of parole under the "critical fact" of child molestation. Given the nature of the question, the juror simply repeated the generic and unenlightening statement, which was initially suggested to him by the trial court, that he would consider all three sentencing options in light of the "facts" proven at trial. However, this generic statement did nothing to modify or withdraw the juror's initial response on the matter indicating that the juror would never consider allowing the possibility of parole if one of those "facts" included child molestation. See *Nance v. State*, 272 Ga. 217, 222-224 (6) (526 SE2d 560) (2000) (addressing a juror who stated that she "could listen to the law and the facts of the case and choose the appropriate sentence" but who made clear that she would then always select death as the appropriate sentence).

Finally, I reject the State's argument that the juror's responses regarding child molestation are irrelevant because the trial court, rather than the jury, would be responsible for imposing the sentences on Edenfield's child molestation charges. Read within the context of the trial court's voir dire questions leading up to the juror's response about child molestation, that response was clearly referring to the sentencing options for murder, albeit murder accompanied by child molestation.

In light of the foregoing, I conclude that the trial court abused its discretion in finding the juror in question to be qualified to serve. See *Nance*, 272 Ga. at 223-224 (6) (addressing a similar claim under an abuse of discretion standard). We have held that a defendant is entitled to a full panel of qualified jurors from which the jury is to be selected through peremptory strikes and that, therefore, the erroneous qualification of one juror who appears on that panel requires

reversal. See *Lance v. State*, 275 Ga. 11, 15 (8) (560 SE2d 663) (2002). Accordingly, I believe that we should reverse Edenfield's death sentence, and I therefore respectfully dissent from the majority's decision to affirm that death sentence. However, reversing Edenfield's death sentence on that basis would not require us to reverse Edenfield's convictions, "because [the juror at issue] was not disqualified on the question of guilt or innocence," and I therefore concur with the majority's decision to affirm Edenfield's convictions. See *Nance*, 272 Ga. at 224 (6).

I am authorized to state that Justice Benham joins this dissent.

DECIDED JUNE 17, 2013 —
RECONSIDERATION DENIED JULY 11, 2013.

*Carl P. Greenberg, James A. Yancey, Jr., Michael W. Tarleton, Margaret E. Flynt, Mark A. Begnaud, Brandon A. Bullard, Jimmonique R. S. Rodgers*, for appellant.

*Jacquelyn L. Johnson, District Attorney, John B. Johnson III, Assistant District Attorney, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Dana E. Weinberger, Sabrina D. Graham, Lyndsey J. Hurst, Assistant Attorneys General*, for appellee.